# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 60594-5-II |
| Respondent, | |
| v. | |
| | UNPUBLISHED OPINION |
| AZIAS DEMETRIUS ROSS, | |
| Appellant. | |

VELJACIC, J. — Azias Ross was the get-away driver for a series of home invasion robberies in 2012. Ross was 19- and 20-years-old at the time. A jury convicted Ross of numerous felony offenses, including: two counts of burglary in the first degree, two counts of robbery in the first degree, three counts of trafficking stolen property in the first degree, unlawful imprisonment, and theft of a firearm.[1] Most of Ross's convictions included firearm enhancements under RCW 9.94A.533(3)(e).

After two appeals, Ross was resentenced in 2023. There, the resentencing court recognized that at the time Ross committed his crimes, he exhibited several mitigating characteristics of youth articulated in *Miller v. Alabama*, 567 U.S. 460, 477-78, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). The court imposed a downward exceptional sentence for all of Ross's underlying convictions, but concluded that it was required to run the firearm enhancements consecutively under RCW

---

[1] Ross was originally convicted for several other offenses, but some convictions were dismissed with prejudice for violating double jeopardy.

9.94A.533(3)(e) and our Supreme Court's decision in *State v. Brown*, 139 Wn.2d 20, 983 P.2d 608 (1999), *overruled in part by State v. Houston-Sconiers*, 188 Wn.2d 1, 391 P.3d 409 (2017). Because of this, the resentencing court sentenced Ross to 378 months in confinement. Ross directly petitioned our Supreme Court to consider the resentencing court's decision, and the case was transferred to this court.

On appeal, Ross primarily argues that the resentencing court erroneously concluded that it lacked the discretion to run the firearm enhancements concurrently. Ross argues that RCW 9.94A.533(3)(e), as applied to young adults such as himself,[2] is "cruel punishment" prohibited under article 1, section 14 of the Washington State Constitution.[3]

We affirm because, as applied to Ross, RCW 9.94A.533(3)(e) is constitutional under article 1, section 14 of the Washington State Constitution.[4]

---

[2] There are several terms used to describe 18-to-20-year-olds. They include late adolescents, young adults, and youthful offenders.

[3] Ross also argues that *Brown* was incorrectly decided. In light of our Supreme Court's recent decision in *State v. Kelly*, 4 Wn.3d 170, 561 P.3d 246 (2024), which reaffirmed its interpretation of RCW 9.94A.533(3)(e) articulated in *Brown*, Ross abandons this argument in his reply brief.

[4] The State assigns error to the resentencing court's conclusion of law 10. Because the State did not cross appeal in this case, it must establish that it is seeking affirmative relief to merit review under RAP 2.4(a). *State v. Sims*, 171 Wn.2d 436, 442, 256 P.3d 285 (2011). Affirmative relief "'normally mean[s] a change in the final result at trial.'" *Id.* (quoting 2A Karl B. Tegland, WASHINGTON PRACTICE: RULES PRACTICE RAP 2.4 author's cmt. 3, at 174 (6th ed. 2004)). "While RAP 2.4(a) does not limit the scope of argument a respondent may make, it qualifies any relief sought by the respondent *beyond affirmation of the lower court*." *Id.* (emphasis added).

The State takes issue with resentencing court's conclusion of law, but it never asks this court for affirmative relief beyond affirming Ross's sentence. And it claims "Ross's reliance on [conclusion of law] 10 is improper," Br. of Resp't at 28, but when carefully reading Ross's briefing, Ross hardly relied on conclusion of law 10 to support that his sentence was unconstitutional. This is insufficient to justify review under RAP 2.4(a). Therefore, we decline to review the State's assignment of error.

FACTS[5]

I.     BACKGROUND

After Ross's jury trial in 2014, the trial court sentenced Ross to 507 months of confinement.[6]  Ross appealed.  In an unpublished opinion, we affirmed Ross's convictions.  *State v. Oeung*, No. 46425-0-II, slip op. at 34 (Wash. Ct. App. Sept. 27, 2016) (unpublished), https://www.courts.wa.gov/opinions/.  But we remanded with instructions to vacate and dismiss some of Ross's convictions with prejudice on the basis of double jeopardy, and we also instructed the trial court to resentence Ross so his sentence would not exceed the statutory maximum under RCW 9.94A.021 and RCW 9.94A.533(3)(g).  *Oeung*, slip op. at 29, 34.

On remand, Ross argued that the resentencing court had full "discretion to fully resentence him on all counts."  *State v. Ross*, No. 81031-6-I, slip op. at 3 (Wash. Ct. App. Aug. 3, 2020) (unpublished),  https://www.courts.wa.gov/opinions/pdf/810316.pdf.  And Ross also urged the resentencing court to consider his youth as a mitigating factor and run his firearm enhancements concurrently.  *Id.*  The resentencing court concluded that it did not have discretion and "denied Ross's request for a full resentencing."  *Id.*

Again, Ross appealed.  On transfer from this court, Division One held that the resentencing "court abused its discretion by failing to recognize its discretion to resentence [Ross] on all

---

[5] The facts related to Ross's underlying convictions are undisputed on appeal.  Because of this, we only provide a brief overview of the procedural history and focus instead on the facts relevant to the resentencing court's decision.  We rely on our prior decisions in *State v. Oeung*, No. 46425-0-II (Wash. Ct. App. Sept. 27, 2016) (unpublished), https://www.courts.wa.gov/opinions/, and *State v. Ross*, No. 81031-6-I (Wash. Ct. App. Aug. 3, 2020) (unpublished), https://www.courts.wa.gov/opinions/pdf/810316.pdf.

[6] Three hundred seventy-eight of the 507 months consisted of firearm enhancements.

counts." *Id.* Because of this, the court remanded the case with instructions to consider whether to conduct another resentencing hearing. *Id.*

II. ROSS'S RESENTENCING

A. Ross's Supporting Materials

Prior to Ross's most-recent resentencing, Ross provided several documents in support covering his background, rehabilitation efforts, and his community involvement. For example, Ross included a forensic psychological examination conducted by Dr. Delton W. Young. In Ross's evaluation, Dr. Young observed that Ross suffered abuse at a young age by the hands of his alcoholic father. Despite this, there were no learning or behavioral problems throughout Ross's elementary and middle school years, and he did well academically, but things changed when Ross got involved with gangs as he entered high school around the age of 13 and 14.

Dr. Young acknowledged that the abuse Ross sustained at home, in addition to "[t]he social context of neighborhood gangs, and gang life all around" Ross, encouraged him to go down a destructive path. Clerk's Papers (CP) at 1128. Because of Ross's age at the time of committing his crimes, Dr. Young explained that "Ross, at 19 and 20[,] was well within [the] age range . . . characterized by immature brain development entailing poor judgment—weak emotional modulation, poor impulse control, little anticipation of consequences, impaired future sense, and heightened susceptibility to peer influence." CP at 1127.

Dr. Young ultimately concluded that Ross posed a "low risk of future violence." CP at 1129. And Dr. Young also found that Ross's "positive adaptation and attitude in [Department of Corrections]" suggested that Ross would adapt to life outside of prison. CP at 1129. These determinations were based on the fact that Ross had renounced his gang affiliation as well as Ross's "personal development and maturation" while serving his sentence. CP at 1129.

B.      Ross's Resentencing Hearing

At the resentencing hearing, the court heard testimony from Ross's family and friends.  For instance, Eleanor Cotterel, Ross's sister, testified to Ross's rehabilitation in prison and how he had a positive impact on her life and other people around him.  Cyril Walrond, who had recently been a fellow inmate with Ross, talked about how Ross engaged in "the intentional work of growing . . . as a man, as a father, as a brother, as a son, as a friend[,] and as a community member."  1 Rep. of Proc. (RP) at 46.

The court also heard from Ross.  Ross testified that he took "full responsibility for [his] actions," and that he was "sorry to [the] victims and their families for the trauma and the harm that [his] actions caused."  1 RP at 67.  And Ross explained that he was a completely different person than who he was in 2012.

After hearing from Ross, defense counsel went into further detail about why an exceptional downward sentence was justified.   Defense counsel argued that imposing consecutive enhancements was cruel punishment under article 1, section 14, of the Washington State Constitution when there was uncontroverted evidence establishing that Ross's "functional maturity at the time of the offenses was less than what his chronological age would suggest."  1 RP at 84-85.  Because of this, defense counsel explained that under *Monschke* and *Houston-Sconiers*, a sentencing court must have the discretion to depart from RCW 9.94A.533(3)(e) and impose firearm enhancements concurrently.

After hearing from both parties, the court explained that it would consider the parties' arguments and issue a decision at a later date.

C.       The Resentencing Court's Findings of Fact and Conclusions of Law

In the resentencing court's detailed findings of fact and conclusions of law, the court evaluated several factors related to "immaturity and youthful brain development."[7]  CP at 1265. First, the court found that "Ross had little appreciation or concern about the long-term or even short-term consequences of his criminal activity."  CP at 1267.  And the court explained that Ross's "lack of appreciation contributed to the relatively speedy repetition of the crimes, and what appear[ed] to be little understanding of the likelihood of apprehension and prosecution."  CP at 1267.

Next, when discussing the "susceptibility to adverse family and environmental influences," the court found that "Ross's early family life and home environment was traumatic, violent, and undoubtedly damaging to his psychological well-being."  CP at 1267-68.  The court discussed that Ross felt "terrorized by his father growing up," and his "father repeatedly beat him and his brothers to the point of bleeding."  CP at 1267.  And the court acknowledged that Ross's tumultuous upbringing contributed to him dropping out of school and drifting "into gang activity, drug use, and addiction."  CP at 1268.  The court also found that Ross's upbringing "contributed to antisocial impulses, lack of empathy and disregard for or lack of understanding of the traumatic effects his criminal behavior would have on his victims."  CP at 1268.

---

[7] Specifically, these factors included:

(A) Impetuosity[;]
(B) Failure to appreciate the immediate and long-term consequences of behavior[;]
(C) Susceptibility to adverse family and environmental issues[;]
(D) Peer pressure[;]
(E) Lack of ability to assist in their own defense[; and]
(F) Uneven capacity for successful rehabilitation requiring an individualized assessment.

CP at 1265.

The court observed that Ross's crimes were a product of peer pressure. The court remarked that "the family and social structure that was absent in Ross's life was supplied by gang affiliation." CP at 1269. And the court noted that "[p]eer pressure, from family and several gang members was direct and indirect, and played a significant role in inducing Ross's involvement in the crimes for which he was convicted." CP at 1269.

Finally, the court found that "Ross's capacity for rehabilitation [was] demonstratively good" and the "risk of recidivism [was] low." CP at 1270. The court observed "Ross . . . made consistent and positive strides in his personal growth" while in prison. CP at 1270. During this period, Ross "had no major . . . or violent infractions while in the custody of the Department of Corrections," he "earned his GED, and also completed higher education classes," and accomplished other educational milestones such as getting certified as a fitness instructor and "an apprentice beekeeper." CP at 1270. Ross was also actively engaged in community involvement, participating in organizations like "the Black Prisoner Caucus, George Jackson's Freedom Coalition, and the Asian Pacific Island Awareness Group."[8] CP at 1270.

Despite finding that several mitigating factors were present, the court concluded they were "superfluous" to its decision. CP at 1265. Under *State v. Brown*, 193 Wn.2d 280, 440 P.3d 962 (2019), the resentencing court explained that RCW 9.94.533(3)(e) "prohibits the Trial Court from imposing an exceptional sentence which runs [firearm sentencing enhancements] concurrent for adult offenders." CP at 1272. And the court determined that *In re Pers. Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021), and *Houston-Sconiers*, 188 Wn.2d 1, were inapplicable to Ross's situation, again reiterating that RCW 9.94A.533(3)(e) circumscribes a sentencing court's

---

[8] The court did not find that the mitigating factors regarding impetuosity and the ability to assist in Ross's legal defense were present.

authority to impose an exceptional sentence for firearm enhancements. The court stated, "[c]ase law directing the Court to do a full, de novo resentencing of a Defendant like Ross with a focus on rehabilitation, or lack thereof, and being mindful of proportionality stands in stark tension with RCW 9.94A.533(3)(e)." CP at 1273.

The court also concluded:

> It is clear to this Court that in an effort to arrive at a sentence that impose[s] the harshest possible punishment on [Ross], the State "unbundled" multiple charges out of three incidents of criminal behavior and proposed as many units of prosecution as could potentially be derived. It is established by the record that the charging document resulted in [Ross] being convicted of multiple crimes that constituted double jeopardy, or involved the same criminal conduct, or resulted in sentence lengths that exceeded the statutory maximum. Thereafter, multiple sentencing proceedings and multiple appeals over many years have been triggered to impose a proper sentence.

CP at 1273.

The court went on to remark,

> This Court has no meaningful sentencing discretion in this case and *would certainly exercise such discretion were it present.* Evaluating Ross as he is today would *compel this court to impose a sentence in which some of the* [*firearm sentencing enhancements*] *would run concurrent with others.* Ross's crimes were no doubt deeply psychologically traumatizing to the victims, though no one was killed or physically injured by the criminal acts of the 19 to 20 year old Ross. *The sentence which the court is compelled to impose,* which is largely ministerial in nature*, is significantly disproportionate to the crimes committed when evaluating Ross as he is today*.
> By application of clear law, Ross is not entitled to consideration of an exceptional sentence providing firearm sentence[ing] enhancements to run concurrent with each other, or his base sentence. Nor under current statutes will he ever be able to appear before the Indeterminate Sentence Review Board to have his potential for release evaluated, since his sentence will be a determinate one.

CP at 1276-77 (emphasis added). In light of the court's view on RCW 9.94A.533(3)(e), the court determined that Ross would be sentenced an exceptional downward sentence of zero months, with

8

credit for time served, which amounted to 378 months of confinement with all the firearm enhancements running consecutively.[9]

D.      Ross's Motion for Reconsideration and Sentencing

Ross moved for the court to reconsider its decision.  At the hearing considering Ross's motion, again, Ross implored the court to rule that a "32-year flat time" sentence amounted to "cruel punishment" under article 1, section 14 of the Washington State Constitution.  2 RP at 100. And because of that, Ross argued that the court had the discretion to run Ross's firearm enhancements concurrently.  But the court disagreed and denied Ross's motion.  The court commented,

> I have not seen any erosion by the Court of Appeals as to the mandatory nature of [RCW 9.94A.533(3)(e)].  I understand and appreciate the fact that as applied to [Ross's] case[,] I think that it results in a grossly disproportionate sentence, but I'm not a knight-errant.
> I'm not here to establish my own concept of justice and beauty.  That's just not the way it works here.  I just don't think that I have the authority to do what you are asking, and, frankly, if I did have the authority . . . , I would certainly probably do [so].

2 RP at 103.

Following the denial of Ross's motion for reconsideration, the court transitioned to Ross's resentencing.  During Ross's allocution, he stated,

> I just want to thank the Court . . . for giving me another opportunity to speak.  I just hope that some time before I'm in my 50s I have an opportunity to return to the community and to be the productive member of society that I know that I can be and to show that people do change and that character is not fixed and we can change our character by the actions and the decisions that we make every day, so thank you.

---

[9] The trial court officially sentenced Ross in line with the decision announced in its findings of fact and conclusions of law at a subsequent hearing when it entered the judgment and sentence order.

2 RP at 107. The court responded, "Thank you, Mr. Ross. I appreciate what you have done. Your efforts toward rehabilitation have been prodigious, and you should have continue on that path." 2 RP at 107.

The court sentenced Ross consistent with its earlier decision, ordering an exceptional downward sentence of 0 months of confinement and 36 months of community custody for Ross's underlying convictions, all to run concurrently with each other. Additionally, the court sentenced Ross to 378 months of confinement with credit for time served based on the 8 consecutive firearm enhancements. The court also ordered $47,075.75 in restitution.

Ross directly petitioned our Supreme Court to review his sentence. The case was transferred to this court.

ANALYSIS

I.    ARTICLE 1, SECTION 14 OF THE WASHINGTON STATE CONSTITUTION DOES NOT PROSCRIBE FIREARM ENHANCEMENT STACKING AS REQUIRED BY RCW 9.94A.533(3)(e) FOR YOUNG ADULTS BETWEEN THE AGES OF 18-20

Ross argues that mandatory stacking of firearm enhancements, as applied to young adults like Ross who exhibit the mitigating characteristics of youth, is cruel punishment prohibited by article 1, section 14 of the Washington State Constitution. To that end, Ross claims that a sentencing court must have the discretion to run enhancements concurrently when warranted. The State argues that such practice is constitutional, and sentencing courts are required to run firearm enhancements consecutively, regardless of whether a young adult exhibits the mitigating characteristics of youth. We agree with the State.

A.    Standard of Review

We review the constitutionality of a statute de novo. *State v. Bassett*, 192 Wn.2d 67, 77, 428 P.3d 343 (2018). "We presume statutes are constitutional," and the defendant "has the burden

10

to prove otherwise beyond a reasonable doubt." *Id.* Under an as-applied challenge, we examine "the statute in the specific circumstances of the case." *State v. Ross*, 28 Wn. App. 2d 644, 646, 537 P.3d 1114 (2023). "Holding a statute unconstitutional as applied does not invalidate the statute but prohibits its application in that specific context and future similar contexts." *Id.*

"We will reverse a [re]sentencing court's decision only if we find 'a clear abuse of discretion of misapplication of the law.'" *State v. Delbosque*, 195 Wn.2d 106, 116, 456 P.3d 806 (2020) (internal quotation marks omitted) (quoting *State v. Blair*, 191 Wn.2d 155, 159, 421 P.3d 937 (2018)). "A [resentencing] court abuses its discretion when its 'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.'" *State v. Jackson*, 195 Wn.2d 841, 850, 467 P.3d 97 (2020) (internal quotation marks omitted) (quoting *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001)). The "mistaken belief that [a sentencing court] did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible" constitutes an abuse of discretion. *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (second alteration in the original) (quoting *State v. Mulholland*, 161 Wn.2d 322, 334, 166 P.3d 677 (2007)).

We review a sentencing court's findings of fact for substantial evidence. *Delbosque*, 195 Wn.2d at 116. "'Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding.'" *Id.* (quoting *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994)). We review a sentencing court's conclusions of law de novo. *State v. Grenning*, 142 Wn. App. 518, 531, 174 P.3d 706 (2008). "'If a determination concerns whether evidence shows that something occurred or existed, it is properly labeled a finding of fact;'" if, however, "'the determination is made by a process of legal reasoning from facts in evidence, it is a conclusion of law.'" *Inland Foundry Co. v. Dep't of Lab. & Indus.*, 106

11

Wn. App. 333, 340, 24 P.3d 424 (2001) (quoting *State v. Niedergang*, 43 Wn. App. 656, 658, 957 P.2d 576 (1986)).

### B. Legal Principles

#### 1. RCW 9.94A.533(3)(e)

Under the Sentencing Reform Act (SRA), a sentencing court generally can impose a "sentence outside the standard sentence range for an offense if it finds, considering the purposes [of the SRA], that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535. But with respect to firearm enhancements, a court has no discretion to do anything except what RCW 9.94A.533(3)(e) requires. RCW 9.94A.533(3)(e) provides, "*Notwithstanding any other provision of law*, all firearm enhancements under this section *are mandatory*, shall be served in total confinement, and *shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements*, for all offenses sentenced under" the SRA. (Emphasis added.)

In 1999, our Supreme Court confirmed that RCW 9.94A.533(4)(e)[10] (former RCW 9.94A.310(4)(e)) limited a sentencing court's discretion "to impose an exceptional sentence" for deadly weapon enhancements. *Brown*, 139 Wn.2d at 28-29. The court's conclusion was based on "the absolute language of" RCW 9.94A.533(4)(e). *Id.* at 29.

When recently interpreting RCW 9.94A.533(3)(e), the statutory provision at issue in this case, our Supreme Court reaffirmed its decision in *Brown*. *State v. Kelly*, 4 Wn.3d 170, 191-95,

---

[10] RCW 9.94A.533(4)(e) provides,

> Notwithstanding any other provision of law, all deadly weapon enhancements under this section are mandatory, shall be served in total confinement, and shall run consecutively to all other sentencing provisions, including other firearm or deadly weapon enhancements, for all offenses sentenced under this chapter.

561 P.3d 246 (2024). Both the majority and dissent in *Kelly* recognized that sentencing courts lack discretion to run firearm enhancements concurrently. *Id.* at 191-92, 207. Like *Brown*, the court's decision was a product of the mandatory language of RCW 9.94A.533(3)(e). *Id.* at 192. And as the majority pointed out, the legislature's declination to pass a law overruling *Brown*, despite having ample opportunity to do so since 1999, suggested "legislative acquiescence" to the court's holding, further supporting that the court in *Brown* correctly interpreted RCW 9.94A.533(4)(e). *Id.* at 193.[11]

2.      Cruel (and Unusual) Punishment, Juveniles, and Young Adults

Article 1, section 14 of the Washington State Constitution prohibits "cruel punishment." And the Eighth Amendment to the United States Constitution protects a criminal defendant from "cruel and unusual punishments."

Much has changed in the context of sentencing juveniles and young adults since *Brown* was decided in 1999. For instance, in 2005, the United States Supreme Court barred the death penalty for defendants "under the age of 18 when their crimes were committed" as violative of the Eighth Amendment's prohibition of "cruel and unusual punishment." *Roper v. Simmons*, 543 U.S. 551, 578, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005). And in 2010, it similarly held unconstitutional life sentences without parole when imposed on juveniles for nonhomicide offenses. *Graham v. Florida*, 560 U.S. 48, 74, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010). In *Graham*, the Court noted that "[l]ife without parole is an especially harsh punishment for a juvenile," because "[u]nder this sentence[,] a juvenile offender will on average serve more years and a greater percentage of [his or her] life in prison than an adult offender." *Id.* at 70. And such a sentence was "not appropriate

---

[11] Both *Brown* and *Kelly* focused only on the statutory interpretation of RCW 9.94A.533(3)(e), (4)(e), not the constitutionality of either provision. 139 Wn.2d at 28-29; 4 Wn.3d at 191-95.

in light of a juvenile nonhomicide offender's capacity for change and limited moral culpability." *Id.* at 74.

In *Miller*, 567 U.S. 460, the Supreme Court went a step further. The Court held unconstitutional *mandatory* life without parole (LWOP) for juvenile homicide offenders because it denied consideration of a defendant's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences." *Id.* at 477. Consequently, the Court explained that in order to impose LWOP, "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles," leaving open the possibility of *discretionary* LWOP. *Id.* at 489.

There has been similar progression in the State of Washington. For example, in *State v. O'Dell*, 183 Wn.2d 680, 695, 358 P.3d 359 (2015), our Supreme Court acknowledged that "age *may* . . . mitigate a defendant's culpability, even if that defendant is over the age of 18." (Emphasis added.) The court explained that there are "fundamental differences between adolescent and mature brains in the areas of risk and consequence assessment, impulse control, tendency toward antisocial behaviors, and susceptibility to peer pressure."[12] *Id.* at 692 (internal footnotes omitted).

In *Houston-Sconiers*, the court contemplated the constitutionality of mandatory firearm enhancements required by RCW 9.94A.533(3)(e), as applied to *juveniles*. 188 Wn.2d at 18-24. Despite the absolute language of RCW 9.94A.533(3)(e), our Supreme Court carved out an exception. 188 Wn.2d at 8, 21. Under the Eighth Amendment, the court held that a sentencing court must "have discretion to impose any sentence below the . . . applicable SRA range *and/or*

---

[12] *O'Dell* considered whether youth could be considered as a mitigating factor for *young adults*. 183 Wn.2d at 695. While some cases are related to juveniles and others focus on young adults, there is a common thread that, at least to some degree, youthful characteristics can be considered to diminish a defendant's culpability. *See, e.g., State v. Ellis*, ___ Wn.3d ___, 579 P.3d 37, 43-44 (2025).

*sentence enhancements.*" *Houston-Sconiers*, 188 Wn.2d at 21 (emphasis added). The court reiterated that "'[C]hildren are different,'" and therefore, the law must account for the "differences between children and adults." *Id.* at 8, 18-19 (alteration in the original) (quoting *Miller*, 567 U.S. at 480).

The Eighth Amendment's protections were further extended to both literal and de facto LWOP sentences for juveniles. *State v. Ramos*, 187 Wn.2d 420, 437-40, 387 P.3d 650 (2017). And under article 1, section 14 of the Washington State Constitution, there was even more development. In *State v. Bassett*, 192 Wn.2d 67, 85-90, 428 P.3d 343 (2018), our Supreme Court held unconstitutional LWOP sentences for juveniles under RCW 10.95.030(3)(a)(ii), *both discretionary and mandatory*. Such practice was categorically barred as cruel punishment because "states [were] rapidly abandoning [LWOP] sentences," children have diminished culpability compared to adults, and "the penological goals of a" LWOP sentence were unsupported when considering the mitigating characteristics of youth. *Id.* at 90.

In 2021, the court in *Monschke* held unconstitutional *mandatory* LWOP for *young adults* as required by RCW 10.95.030(1). 197 Wn.2d at 326. The court's holding was premised on the understanding "that no meaningful neurological bright line exists between age 17 and age 18." *Id.* As a result, it was imperative that "sentencing courts . . . have discretion to take the mitigating qualities of youth—those qualities emphasized in *Miller* and *Houston-Sconiers*—into account for defendants younger and older than 18." *Id.* at 326. The court in *Monschke*, however, noted that "[n]ot every [18]- and 20-year-old will exhibit these mitigating characteristics." *Id.* Consequently, the court left "it up to sentencing courts to determine which individual defendants merit leniency for the" characteristics of youth. *Id.*

Most recently, our Supreme Court, in the context of young adults, reiterated that "age alone is not a basis for an exceptional sentence," but "[s]entencing courts must meaningfully exercise their discretion to consider a defendant's youth." *State v. Ellis*, ___ Wn.3d ___, 579 P.3d 37, 43-44 (2025).

   3.   Young Adults, Firearm Enhancements, and Subsequent Cases Post-*Monschke* and *Houston-Sconiers*

Subsequent cases have concluded that *Houston-Sconiers* is applicable only to juveniles. *State v. Mandefero*, 14 Wn. App. 2d 825, 831-32, 837, 437 P.3d 1239 (2020). *Mandefero* did not have the benefit of *Monschke*. Nevertheless, even after *Monschke*, courts have held that *Houston-Sconiers* is inapplicable to young adults. *State v. Krueger*, 28 Wn. App. 2d 549, 561-62, 540 P.3d 126 (2023), *review denied*, 2 Wn.3d 1034 (2024).

In *Krueger*, the defendant was convicted of, among other crimes, aggravated murder in the first degree and three firearm enhancements under RCW 9.94.533(3)(a). *Id.* at 553. Krueger was sentenced to mandatory LWOP in 1998. *Id.* Following *Monschke*, Krueger was resentenced because he was 20 years old at the time of committing the offense. *Id.* The resentencing court ultimately "resentenced Krueger to 420 months with an additional 60 months for the firearm enhancement." *Id.* at 553-54.

On appeal, Krueger argued that the resentencing court possessed the discretion to waive the firearm enhancements. *Id.* at 561. But Division One of this court disagreed. *Id.* at 561-62. The court reasoned that *Houston-Sconier* was a "narrow [holding] and applie[d] only to juveniles." *Id.* at 562. And with respect to *Monschke*, the court similarly found that it did not "provide courts with full discretion to depart from the sentencing guidelines and otherwise mandatory sentencing enhancements for adults." *Id.* (internal quotation marks omitted). So even as a young adult, the

resentencing court was still required to impose the firearm enhancement as required by RCW 9.94A.533(3)(a). *Id.*

In the same vein, subsequent cases have clarified that *Monschke* is a limited holding. *See State v. Nevarez*, 24 Wn. App. 2d 56, 60-62, 519 P.3d 252 (2022) (holding that because the defendant "did not receive a mandatory LWOP sentence, the court's conclusion in *Monschke* [was] inapplicable"), *review denied*, 1 Wn.3d 1005 (2023). More specifically, *In re Pers. Restraint of Kennedy* indicated that *Monschke* was relevant only to individuals "convicted of aggravated first degree murder under RCW 10.95.020 [or] sentenced to mandatory LWOP under RCW 10.95.030." 200 Wn.2d 1, 24, 513 P.3d 769 (2022). Moreover, the court observed that Kennedy failed to identify any "reasoning in *Monschke* that extends its holding beyond the context of mandatory LWOP sentences or any reasoning that extends *Houston-Sconiers*'s holding." *Id.* at 23 n.5. Likewise, in *In re Pers. Restraint of Davis*, the court reiterated that "*Monschke* concerns only defendants who were sentenced pursuant to RCW 10.95.030(1)." 200 Wn.2d 75, 77, 514 P.3d 653 (2022).[13] The court repeated its holding in *State v. Olsen*, 3 Wn.3d 689, 697, 555 P.3d 868 (2024).

---

[13] Ross argues that *Kennedy* and *Davis* are distinguishable on the basis that these cases concerned a rule relevant only to personal restraint petitions. We are unpersuaded by this claimed distinction.

C.      Ross's Appeal[14]

1.      Ross's Reliance on *Houston-Sconiers* and *Monschke* is Misplaced

At the outset, Ross argues that *Houston-Sconiers*, read in tandem with *Monschke*, supports that firearm enhancement stacking, as applied to young adults, is unconstitutional under article 1, section 14 of the Washington State Constitution.  Our discussion above forecloses this argument.

We take our Supreme Court at its word that *Monschke* was a limited holding, confined only to aggravated murder in the first degree and mandatory LWOP sentences imposed under RCW 10.95.030(1).  *See, e.g.*, *Kennedy*, 200 Wn.2d at 23-24.  Even though courts are required to take the mitigating characteristics of youth for young adults into consideration, which can show diminished culpability of a defendant, *Ellis*, 579 P.3d at 43-44, our Supreme Court has drawn the line when it comes to young adults and firearm enhancements, *see Krueger*, 28 Wn. App. 2d at 561-622.[15]

---

[14] Ross challenges finding of fact 5 where the resentencing court found that the mitigating characteristics of youth were "largely superfluous" to its decision.  Br. of Appellant at 1-2 (quoting CP at 1264).  Because the court ultimately concluded that it lacked the discretion to run the firearm enhancements concurrently, this finding is more akin to a conclusion of law that we review de novo.  *See Inland Foundry Co.*, 106 Wn. App. at 340.

[15] We hope for future clarity in the applicability of *Monschke* to other contexts outside of RCW 10.95.030(1) and aggravated murder in the first degree, especially RCW 9.94A.533(3)(e).  Existing cases, such as *Kennedy* or *Davis*, purportedly say that *Monschke* is limited.  *Kennedy*, 200 Wn.2d at 24; *Davis*, 200 Wn.2d at 83-84.  But in those same cases, the court suggested that *Monschke* was not material to the defendants' personal restraint petitions, in part, because the sentencing court in each case *possessed some level of discretion* when sentencing the defendants.  *Kennedy*, 200 Wn.2d at 24 ("Kennedy was sentenced under a 'regular sentencing statute' that allows for discretion and does not implicate the same concerns under the Eighth Amendment or article 1, section 14. . . *[D]iscretion such as the trial court exercised in Kennedy's case is the solution to the constitutional problem identified by the lead opinion in Monschke*.") (emphasis added); *Davis*, 200 Wn.2d at 83 (explaining that in contrast to *Monschke*, "the court in Davis's case had discretion to impose an exceptional sentence based on various factors[,] including youth").  That is not the case here.

Therefore, we conclude that the resentencing court did not abuse its discretion when it concluded that it lacked discretion to run Ross's firearm enhancements concurrently under *Houston-Sconiers* and *Monschke*.

> 2. It is Well Established That Article 1, Section 14 of the Washington State Constitution is more Protective than the Eighth Amendment

Next, Ross argues that the *Gunwall* analysis[16] supports that his "mandatory sentence is cruel." Br. of Appellant at 53. We agree with Ross that article 1, section 14 is more protective of young adults than the Eighth Amendment, but we do not agree that this conclusion is dispositive of Ross's appeal.

Courts "have 'repeated[ly] recogni[zed] that the Washington State Constitution's cruel punishment clause often provides greater protection than the Eighth Amendment.'" *Monschke*, 197 Wn.2d at 311 n.6 (alterations in the original) (internal quotation marks omitted) (quoting *Bassett*, 192 Wn.2d at 78). Therefore, we need not engage in a *Gunwall* analysis to determine if article 1, section 14 of the Washington State Constitution is more protective than the Eighth Amendment of the United States Constitution.[17] *Id.* Even though article 1, section 14 of the

---

In light of *Houston-Sconiers*, holding that RCW 9.94A.533(3)(e) is constitutional under article 1, section 14, as applied to young adults like Ross, appears to draw a "bright line" between 17 and 18-year-olds that *Monschke* discouraged. *Houston-Sconiers*, 188 Wn.2d at 18-24; *Monschke*, 197 Wn.2d at 326. When turning to the facts of this case, the resentencing court found that several mitigating characteristics of youth diminished Ross's culpability and suggested that it would run some of the firearm enhancements concurrently if it had the authority to do so. Had Ross been 2 to 3 years younger when committing the offenses, his sentence could be remarkably different from the one he currently faces. This exemplifies the harsh and arbitrary outcome for a defendant like Ross.

[16] *State v. Gunwall*, 106 Wn.2d 54, 58, 720 P.2d 808 (1986).

[17] Under *Ramos*, a party is required to provide a *Gunwall* analysis. 187 Wn.2d at 454. But other cases explain that we do not need to engage in a *Gunwall* analysis when it is already established that a state constitutional provision is more protective than the U.S. Constitution. *E.g., Monschke*, 197 Wn.2d at 311 n.6.

Washington State Constitution is more protective than the Eighth Amendment, it does not mean that Ross's claim is meritorious.

> 3. Ross Has Not Met His Burden to Establish That Firearm Enhancement Stacking under RCW 9.94A.533(3)(e) is Categorically Barred as "Cruel Punishment" Under Article 1, Section 14 of the Washington State Constitution

Independent from Ross's reliance on *Houston-Sconiers* and *Monschke*, Ross argues that firearm enhancement stacking, as applied to young adults, is categorically barred under article 1, section 14 of the Washington State Constitution. We disagree.

Under a categorical bar analysis, we "determine if a punishment is disproportionate" under article 1, section 14 of the Washington State Constitution. *State v. Reynolds*, 2 Wn.3d 195, 203-04, 535 P.3d 427 (2023). The analysis has two steps. *Id.*; *Bassett*, 192 Wn.2d at 85-86.

First, we evaluate "whether there are 'objective indicia of a national consensus against [a] sentencing practice.'" *Reynolds*, 2 Wn.3d at 204 (quoting *Bassett*, 192 Wn.2d at 83). "'[T]he clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures.'" *Bassett*, 192 Wn.2d at 85-86 (internal quotation marks omitted) (quoting *Graham*, 560 U.S. at 62). "'It is not so much the number of these States that is significant, but the consistency of the direction of change.'" *Bassett*, 192 Wn.2d at 86 (quoting *Atkins v. Virginia*, 536 U.S. 304, 315, 122 S. Ct. 2242, 153 L. Ed. 2d (2002)).

Second, we determine "whether our independent judgment, based on controlling precedent and our understanding and interpretation of the cruel punishment provision's text, history, and purpose, weigh[ed] against the sentencing practice." *Reynolds*, 2 Wn.3d at 204. We also consider "'the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question' and 'whether the challenged sentencing practice serves legitimate penological goals.'" *Bassett*, 192 Wn.2d at 87 (quoting *Graham*, 560 U.S. at 67).

"Issues of culpability, the severity of the punishment, and whether penological goals are served all allow the court to include youth-specific reasoning into the analysis." *Bassett*, 192 Wn.2d at 84. No one factor is conclusive in this analysis. *See id.* at 87-90.

Ross fails to demonstrate that there is a national consensus prohibiting firearm enhancement stacking for young adults. In his brief, Ross points to the lead opinion in *Monschke* where it found that "there is . . . an affirmative trend among states to carve out rehabilitative space for 'young' or 'youthful' offenders as old as their mid-20s." Br. of Appellant at 61-63; *Monschke*, 197 Wn.2d at 312 n.8. But as the dissent in *Monschke* correctly observed, we look to states prohibiting "*the sentencing practice at issue*," not an overarching trend throughout the country. *Monschke*, 197 Wn.2d at 338-39 (Owens, J., Dissenting) (emphasis added). Ross does not provide an example of a state where a sentencing court is prohibited from running firearm enhancements concurrently for young adults. Therefore, the first step of the categorical bar analysis does not weigh in favor of finding that courts have discretion to depart from mandatory sentencing guidelines for young adults.[18]

Our analysis does not end at step one. *See State v. Moretti*, 193 Wn.2d 809, 823, 446 P.3d 609 (2019) (analyzing the second step of the categorical bar analysis even though the court concluded that there was no evidence suggesting a national consensus against the sentencing practice at issue). Ross similarly fails to establish that a categorical bar is warranted based on the other factors considered at step two.

---

[18] Ross attempts to distinguish the dissent's argument in *Monschke* by highlighting that Ross's case does not involve murder; instead, Ross's underlying crimes involved "accomplice or inchoate liability for home invasion robberies." Br. of Appellant at 64. Ross misses the point articulated by the dissent in *Monschke*. Under *Bassett*, Ross must show that there is a national consensus prohibiting the sentencing practice at issue, meaning he must show that there is a positive trend toward prohibiting stacking firearm enhancements for young adults. *Monschke*, 197 Wn.2d at 338-39 (Owens, J., Dissenting).

As discussed above, article 1, section 14 of the Washington State Constitution being more protective than the Eighth Amendment does not on its own prohibit the sentencing practice at issue. In the context of young adults, our Supreme Court has only extended the protections of article 1, section 14 in one instance: *Monschke*. 197 Wn.2d 326; *Olsen*, 3 Wn.3d at 696-97; *Kennedy*, 200 Wn.2d at 24; *Davis*, 200 Wn.2d at 81; *Moretti*, 193 Wn.2d at 818, 820. With this in mind, there is no longstanding practice of treating young adults differently than any other adult to warrant such prohibition.

Next, we consider the characteristics of Ross and his crimes. It is true that Ross exhibited several of the mitigating characteristics of youth. But it is also true that Ross's crimes had a "deeply psychologically traumatizing [impact] to the victims." CP at 1276.

Unlike the defendants in *Bassett*, Ross is not facing a life without parole sentence. *Contra* 192 Wn.2d at 87-90. And Ross received an exceptional sentence (before the imposition of the firearm enhancements) of zero years in confinement. This is well below the low end of the standard range that the SRA would otherwise require. As our Supreme Court explained in *Moretti*, "'age is not a per se mitigating factor automatically entitling every [young adult] to an exceptional sentence.'" 193 Wn.2d at 824 (quoting *O'Dell*, 183 Wn.2d at 695). And here, the resentencing court appropriately considered Ross's youthfulness at sentencing consistent with our Supreme Court's precedent. *O'Dell*, 183 Wn.2d at 698-99. As such, we are unpersuaded that Ross's characteristics alone justify a categorical bar.[19]

---

[19] By saying this, we do not diminish Ross's rehabilitative efforts while serving his sentence. Like the resentencing court, we too commend Ross on his efforts to make a new life for himself in spite of his circumstances.

Finally, we consider the penological justifications for Ross's sentence.[20] Ross argues that "[it is] hard to imagine what penological (or societal) goal is served by locking up a man like Ross for three mandatory decades of hard time." Br. of Appellant at 66. As illustrated by the State, however, Ross overlooks the legislature's intent behind RCW 9.94A.533(3)(e), which serves several penological goals: retribution, incapacitation, and deterrence.

"In 1995, the Legislature enacted, without amendment, Initiative 159, entitled 'Hard Time for Armed Crime.'" *Brown*, 139 Wn.2d at 25. "Initiative 159 'split the previous deadly weapon enhancement into separate enhancements for firearms and for other deadly weapons, and broadened their application to all felonies except those in which using a firearm is an element of the offense.'" *Id.* Thus, this new law, including RCW 9.94A.533(3)(e), *explicitly intended to increase sentences for armed crime*, thereby emphasizing the penological goals of retribution, deterrence, and incapacitation. *See id.*; LAWS OF 1995, ch. 129, § 1. For better or for worse, our state has prioritized retributive penological interests over rehabilitation for provisions like RCW 9.94A.533(3)(e). *See Brown*, 139 Wn.2d at 25; *Kelly*, 4 Wn.3d at 191-95. It is not the role of this court to ignore that desire.[21]

It is true that in *Bassett*, our Supreme Court acknowledged that punishment is less compelling in the circumstance of juvenile sentencing because "'the same characteristics that render juveniles less culpable than adults'—their immaturity, recklessness, and impetuosity— make them less likely to consider potential punishment." 192 Wn.2d at 88 (quoting *Graham*, 560

---

[20] The relevant penological justifications include: (1) retribution, (2) incapacitation, (3) rehabilitation, and (4) deterrence. *Bassett*, 192 Wn.2d at 88.

[21] We appreciate the materials that Ross provides in his reply brief discussing the penological justifications (or lack thereof) regarding mandatory prison sentences like the one Ross faces. But we are a court, not a legislature, and this issue is best left for the people to consider.

U.S. at 74). But Ross is a young adult, and other cases have demonstrated that a lengthy sentence for such offenders is not necessarily unconstitutional. *State v. Carter*, 3 Wn.3d 198, 224, 548 P.3d 935 (2024) (holding that a 46-year sentence for an 18-year-old was appropriate given "detailed findings by the superior court [that] comported with the requirements of individualized consideration of the mitigating qualities of youth").

Moreover, as explained above, the resentencing court considered Ross's mitigating characteristics of youth and imposed an exceptional sentence for Ross's underlying offenses in light of those factors. This supports that Ross's sentence comports with the penological justification of rehabilitation, just not as much as Ross may wish. In sum, Ross's sentence satisfies all penological justifications.

Therefore, we conclude that Ross has not established that RCW 9.94A.533(3)(e) is categorically barred, as applied to young adults, as cruel punishment prohibited by article 1, section 14 of the Washington State Constitution beyond a reasonable doubt.[22]

CONCLUSION[23]

Accordingly, we affirm Ross's sentence.

---

[22] As explained by our Supreme Court in *Bassett*, the categorical bar analysis is more appropriate to evaluate claims like Ross's. 192 Wn.2d at 83-84. In light of this, Ross did not provide a *Fain* analysis in his briefing. Therefore, we will not conduct a *Fain* analysis.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Veljacic, J.

I concur:

Cruser, A.C.J.

MAXA, J. (dissenting) – I believe that the reasoning behind the Supreme Court's holding in *In re Personal Restraint of Monschke*, 197 Wn.2d 305, 482 P.3d 276 (2021), supports giving trial courts discretion to disregard mandatory firearm enhancements when sentencing a 19- or 20-year old offender, just as trial courts have that discretion when sentencing a juvenile offender. Therefore, I dissent.

In *Monschke*, the Supreme Court's lead opinion[24] emphasized that neuroscience does not support a distinction between 17- and 18-year-olds. *Id.* at 312-13. The lead opinion stated, "The petitioners have shown that many youthful defendants older than 18 share the same developing brains and impulsive behavioral attributes as those under 18. Thus, we hold that *these 19- and 20-year-old petitioners must qualify for some of the same constitutional protections as well*." *Id.* at 313 (emphasis added).

The *Monschke* lead opinion contained a section heading that stated the following: "*NO MEANINGFUL DEVELOPMENTAL DIFFERENCE EXISTS BETWEEN THE BRAIN OF A 17-YEAR-OLD AND THE BRAIN OF AN 18-YEAR-OLD.*" *Id.* at 321. The lead opinion noted that the same factors that supported extension of constitutional protection to juveniles – "juveniles' lack of maturity and responsibility, their vulnerability to negative influences, and their transitory and developing character" – "weigh[ed] in favor of offering similar constitutional protections to older offenders, also, because neurological science recognizes no meaningful distinction between 17- and 18-year-olds as a class." *Id.* And the lead opinion stated that three cited articles supported the position that "there is no distinctive scientific difference, in general, between the brains of a 17-year-old and an 18-year-old." *Id.* at 322.

---

[24] Four Justices signed Justice Gordon McCloud's lead opinion. Chief Justice González concurred, but wrote separately to disagree on an issue not relevant here.

Later, the lead opinion stated that the petitioners have shown that "no meaningful neurological bright line exists between age 17 and age 18 or, as relevant here, between age 17 on the one hand, and ages 19 and 20 on the other hand." *Id.* at 326. And in conclusion, the court stated, "There is no meaningful cognitive difference between 17-year-olds and many 18-year-olds." *Id.* at 329.

The Supreme Court previously had held that a mandatory life without parole sentence was unconstitutional for juvenile offenders. *State v. Bassett*, 192 Wn.2d 67, 90, 428 P.3d 343 (2018). Based on the reasoning discussed above, the court in *Monschke* extended this rule to young adults, holding that a mandatory life without parole sentence was unconstitutional for 18- to 21-year old offenders. 197 Wn.2d at 325-26.

In *State v. Houston-Sconiers*, the Supreme Court held that for juvenile offenders, trial courts "must have discretion to impose any sentence below the otherwise applicable SRA range and/or sentence enhancements." 188 Wn.2d 1, 21, 391 P.3d 409 (2017). The holding in *Houston-Sconiers* applies only to juveniles. *Id.* And arguably, the holding in *Monschke* is limited to mandatory life without parole sentences. *See In re Pers. Restraint of Kennedy*, 200 Wn.2d 1, 24, 513 P.3d 769 (2022).

But the reasoning in *Monschke* compels the conclusion that trial courts must have the same discretion to disregard mandatory firearm enhancements when sentencing a 19- or 20-year old offender as they have when sentencing juveniles. *"[N]o meaningful neurological bright line exists between age 17 and age 18 or, as relevant here, between age 17 on the one hand, and ages*

*19 and 20 on the other hand."* *Monschke*, 197 Wn.2d at 326 (emphasis added). I would remand to allow the trial court to exercise its discretion to sentence Ross without regard to the mandatory firearm enhancements.

_____
Maxa, J.